LODGED
CLERK, U.S. DISTRICT COURT
11/03/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: KM   DEPUTY

ORIGINAL

FILED
CLERK, U.S. DISTRICT COURT
NOV - 3 2025
CENTRAL DISTRICT OF CALIFORNIA
BY      DEPUTY

1  BILAL A. ESSAYLI
   First Assistant United States Attorney
2  IAN V. YANNIELLO
   Assistant United States Attorney
3  Chief, National Security Division
   JOHN J. LULEJIAN (Cal. Bar No. 186783)
4  Assistant United States Attorney
        1200 United States Courthouse
5       312 North Spring Street
        Los Angeles, California 90012
6       Telephone: (213) 894-0721
        Facsimile: (213) 894-0141
7       E-mail:    John.Lulejian@usdoj.gov

8  Attorneys for Plaintiff
   UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF<br><br>ANDREW GARRONI,<br><br>A Fugitive from the Government of the Federal Republic of Germany. | No. 2:25-MJ-06848-DUTY<br><br>COMPLAINT<br><br>FOR PROVISIONAL ARREST WITH A VIEW TOWARD EXTRADITION (18 U.S.C. § 3184); ORDER THEREON<br><br>**(UNDER SEAL)** |

TO:  Honorable Jacqueline Chooljian
     United States Magistrate Judge
     Central District of California

    I, JOHN J. LULEJIAN, being duly sworn, depose and state that I am an Assistant United States Attorney for the Central District of California and act for the United States in fulfilling its obligations to the Government of the Federal Republic of Germany ("Germany") pursuant to the Treaty Between the United States of America and the Federal Republic of Germany Concerning Extradition, U.S.-F.R.G., June 20, 1978, T.I.A.S. No. 9785, as amended by the Supplementary Extradition Treaty with the Federal Republic of Germany, U.S.-F.R.G., Oct. 21, 1986, S. Treaty Doc. No. 100-6 (1987),

as amended by the Second Supplementary Treaty to the Treaty Between the United States of America and the Federal Republic of Germany Concerning Extradition, U.S.-F.R.G., Apr. 18, 2006, S. Treaty Doc. No. 109-14 (2006) (collectively, the "Treaty").

In accordance with Title 18, United States Code, Section 3184, I charge on information and belief as follows:

1. That the Government of Germany has requested the provisional arrest of the fugitive, ANDREW GARRONI ("GARRONI" or the "fugitive"), pending extradition, pursuant to Article 16 of the Extradition Treaty, as amended by Article 3 and Article 4 of the Second Supplementary Treaty.

2. That according to the information provided by the Government of Germany, GARRONI is wanted by Germany so that he may be prosecuted for Formation of a Criminal Organization Abroad, in violation of Section 129 paras. 1, 5 and 129b para. 1 of the German Criminal Code.[1]

3. That on or about May 13, 2025, the Koblenz District Court, which is authorized by German law to issue warrants of arrest, issued a warrant for GARRONI's arrest for this offense. The warrant remains valid and enforceable.

4. That the offense for which the fugitive's extradition is sought is covered by Article 2 of the Extradition Treaty.

5. That German authorities allege that Germany has jurisdiction over the offense GARRONI is accused of having committed.

---

[1] The United States is seeking a warrant for GARRONI's provisional arrest based only on this charge, but doing so is without prejudice to proceeding on additional charges when Germany's formal request for extradition has been reviewed by the Department of State and is presented to the Court.

6. That Germany's request contains information that was developed during an extensive international investigation that resulted in evidence in the form of banking and financial records, business records, witness and victim statements, e-mail communications, text messages via the messaging services WhatsApp and Telegram, and other records. Germany's case is also based on evidence developed during the 2020 prosecutions of the late Hamid "Ray" Akhavan ("R. Akhavan") and Ruben Weigand ("Weigand"), a current co-defendant, for similar criminal conduct in the United States District Court for the Southern District of New York, 1:20-cr-00188-JBR (S.D.N.Y. 2020),[2] including the results of searches of two mobile telephones and a laptop. Germany presents the following facts, among others, related to the above offense in support of its request for the provisional arrest of GARRONI:

    i. Germany is prosecuting a global criminal organization, which through separate but related networks, falsified subscriptions to online "services" that were not provided, fraudulently charged debit and credit cards for those nonexistent services through German payment service providers, and distributed the wrongly charged money to the participants in the global criminal organization. Both networks, including the FSX network at issue in this case, created shell companies that purportedly operated fictitious Internet dating websites and fraudulently registered those

---

[2] See https://www.justice.gov/usao-sdny/pr/two-architects-fraudulent-scheme-sentenced-processing-over-150-million-through-us (R. Akhavan and Weigand sentenced following conviction of "scheme to deceive U.S. issuing banks and credit unions into effectuating more than $150 million of credit and debit card purchases of marijuana by disguising those transactions as purchases of other kinds of goods, such as face creams and dog products.")

companies with German payment service providers to facilitate financial transactions between unsuspecting victims and the criminal organization. German authorities accuse GARRONI of playing a critical role in the FSX network between or about March 2016 and July 2021.

<u>Overview of Criminal Conduct</u>

b. Germany alleges that the GARRONI and other participants in the criminal organization (collectively "the network" or "the organization") deceived German banks into processing more than €73 million, and attempted to deceive German banks into processing an additional €88 million, in credit and debit card payments for the purchase of "services" that the cardholders did not order and for which they often were unaware they were being charged. The charges the customers faced were disguised as payments to fictitious online merchants, including transactions that appeared to be for dating websites. In furtherance of the scheme, the network created fictitious offshore corporations that operated fake dating websites. The network then worked with third-party payment service providers (the "German payment service providers") to onboard those corporations with the providers, thus allowing the companies to process debit and credit transactions through their websites. The network convinced German payment service providers to honor fictitious charges that appeared to be legitimate charges for services rendered.

c. German authorities determined that between or about March 2016 and July 2021, over 8.6 million subscriptions were improperly charged via the FSX network:

4

i. The network improperly charged victims' credit cards in more than 1.3 million transactions, thereby causing financial damage of over €73 million.

ii. In an additional approximate 7.3 million instances, the FSX network submitted fictitious subscriptions to the German payment service providers that did not result in charges to credit cards because the data used was either outdated or incorrect or the credit card limit was exhausted. These attempted transactions would have yielded more than €88 million in additional proceeds had they been successful.

Summary of the FSX Scheme

d. German authorities determined that the FSX scheme to defraud consisted of the following components:

i. First, the FSX network used phishing and other methods to obtain credit card information to charge for subscriptions to Internet dating websites. Specifically, the FSX network appropriated credit card information and data from large phishing attacks in which cardholders clicked on banner ads, downloaded Internet games, or registered for sweepstakes and potential fake shops. The FSX network also purchased card data on the Darknet and from leaks following ransomware attacks, where hackers published or auctioned the stolen files on the Darknet.

ii. Second, the FSX network used shell companies disguised as legitimate merchants. The FSX network was a part of a complex group-like corporate structure consisting of many letterbox companies in the United Kingdom, Cyprus, Luxembourg, Canada, and the

United States[3], through which approximately 79 front companies operated at least 431 Internet pages. To appear legitimate, each fictious merchant ran five to seven webpages suggesting that they were involved in selling legitimate dating services. However, these front companies were used to facilitate the processing of charges for which no services were ever provided. The scheme even involved generating fake traffic to those websites to make it appear to payment providers and financial institutions that the websites were operating legitimate online businesses with real customers. These websites could not be found using ordinary search engines such as "Google" or "Bing." Further, the dating content pages of many of the FSX websites were almost identical to each other in terms of their design and menu navigation.

        iii. <u>Third</u>, the issuing banks allowed the fictitious merchants to set up accounts to process credit and debit card transactions. After creating the fictitious merchant companies, the FSX network established Visa and MasterCard merchant processing accounts with one or more offshore acquiring banks. Despite being based outside of Germany, many of the fictitious merchants purported to maintained Germany-based customer service numbers, which lent them legitimacy.

---

[3] An investigation of the fictitious merchants and their headquarters revealed that they had been set up in groups and that their business addresses often led to single-family homes or referred to purely virtual offices. An audit of a German payment service provider revealed that that managers of these fictitious merchants were already at retirement age and could not describe the business model or the financial background of the companies purportedly managed by them. In some cases, the managers were not even aware that they had been named as a managing director of a company. All of this underscores that these managers were not actually managing anything at the merchants.

   iv. <u>Fourth</u>, relying on the issuing banks and documents submitted by the fictitious merchants, German payment service providers agreed to accepted credit card charges for the merchants. The FSX network would ensure that the merchants and their websites were accepted as customers by the German payment service providers and were onboarded for the settlement of credit card transactions. Once the German payment service providers accepted the fictitious merchants as customers, members of the network could collect the unauthorized debits, in part by maintaining close contacts with high-ranking employees of the German payment service providers.

  e. <u>Fifth</u>, fictitious merchants charged victims' credit cards, mostly VISAs and MasterCards. Witnesses told German authorities that their credit card data were improperly used to subscribe to the use of dating services on the above websites without the cardholders' knowledge. As a result, recurring monthly subscriptions of up to €50 were billed via these credit cards, often over several years. In many cases, the victims did not notice that they had been harmed, as their credit card statements contained only cryptic descriptors and did not reference the corresponding websites.

  f. <u>Sixth</u>, credit card payments were funneled back to the FSX network, thereby laundering the proceeds of the credit and debit card fraud. All funds obtained through the criminal scheme were transmitted to FSX Holdings Limited Liability ("FSX Holdings"), a business located in Florida.[4] GARRONI, along with other members of

---

[4] Two other businesses, Greenwich Business Solution and its subsidiary, Affiliate Internet Marketing Limited, are the "operating arm" of FSX Holdings. Greenwich Business Solutions, located in
*(footnote cont'd on next page)*

7

the network, managed FSX Holdings and had decision-making authority on behalf of the FSX network. FSX is considered a "master merchant," which is the company the network used as the head of all the fictitious merchants. As detailed below, between or about March 2016 and July 2021, GARRONI operated the FSX network from the United States.

### Structure of the FSX Network

g.  The network appears to resemble an internationally active corporation. The FSX network built up a complex company structure and a supposed franchise system under the leadership of GARRONI and others. In the FSX network, the franchisees were the fictitious merchants, and the franchisors were the leaders of the network. GARRONI and other leaders of the FSX network received the entire revenue of the fictitious merchants, while the fictitious merchants only received €5,000 per year and did not receive any share of the sales revenue. Thus, the franchise system is a façade.

h.  It is apparent from a typical contract between the fictitious merchants and the German payment providers that the franchisees (fictitious merchants) pay approximately ninety percent of their revenue to the licensor. In exchange, the FSX network offered the franchisees packaged solutions such as web hosting, software, traffic processing, and customer support. This structure completely diverges from the classic and widespread franchise model, in which franchisees are economically independent.

---

Canada but operated by one of GARRONI's co-defendants in the United Kingdom, was a letterbox company that did not carry out any economic activity.

   i. According to information provided by a German payment services provider, FSX leadership, including GARRONI, has access to the money that was fraudulently obtained for the network.

   j. The German investigation also revealed that the fictitious merchants' content design and orientation of the Internet pages were not carried out by the merchants. The fictitious merchants also did not obtain their URLs. Instead, these tasks were handled by GARRONI and other members of the FSX network.

### Summary of Victim Testimony

   k. Given the enormous number of victims whose debit or credit cards were fraudulently charged by the FSX network, Germany has provided summaries of statements from a sampling of victims from across Europe. Specifically, during their investigation, authorities interviewed approximately 112 witnesses from Germany. All these witnesses stated that they had never subscribed to and had not used the services of the websites they had been given.

   l. German authorities also interviewed over 200 witnesses from Croatia, the Czech Republic, Estonia, Greece, Latvia, Poland and Sweden. Almost all the witnesses agreed that they had not subscribed to the websites for which they were charged. They confirmed to German authorities that they did not want or willfully authorize the debits from their credit cards. The breakdown of those witnesses follows:

    i. <u>Estonia</u>: Sixteen witnesses stated that they had never used their credit cards to subscribe to the websites in question, nor had they used the services of the websites. Of these, approximately 31 percent of the witnesses had previously entered their credit card details on other dating and/or erotic sites and/or

gambling sites and had only wanted to subscribe there, not to the websites in question. Seven of the 16 witnesses said they noticed some or all the debits, and nine witnesses did not notice the debits.

    ii. <u>Greece</u>: Eight witnesses stated that they have never visited nor subscribed to the websites that charged their cards. Of these, approximately 29 percent of the witnesses had previously entered their credit card details on other dating and/or erotic sites and had only wanted to subscribe there – but not on the websites that were being held. Only one of the witnesses interviewed noticed the debit on his credit card.

    iii. <u>Croatia</u>: Twenty-two witnesses stated that they had never subscribed to websites with their credit cards or used the services of the websites about which they were asked. Of these, approximately 47 percent of the witnesses had previously entered their credit card details on other dating and/or erotic sites but did not enter their information on the websites about which they were asked. Seven of the 16 witnesses stated that they noticed all or part of the debits, while nine witnesses did not notice the debits.

    iv. <u>Latvia</u>: Thirty-six witnesses stated that they had not used nor subscribed to any of the websites using their credit cards. Of these, approximately 33 percent of the witnesses had previously knowingly and intentionally entered their credit card data on other dating and/or erotic and/or gaming and/or sweepstakes sites but not on the internet sites that were the subject of Germany's investigation. Three quarters of the witnesses stated that they noticed all or part of the debits, while the rest did not.

    v. <u>Poland</u>: Forty-two witnesses stated that they had never subscribed to the websites with their credit cards and had not

used the services of the websites.  Of these, approximately 29 percent of the witnesses had previously entered their credit card details on other dating and/or erotic sites but did not knowingly or intentionally enter such information on the websites in question. Only 10 of the 43 witnesses stated that they noticed some or all of the debits, and 32 witnesses had not noticed the debits at all.

        vi.  <u>Czech Republic</u>:  Of the fifty-seven witnesses, approximately 96.5 percent said that they never used their credit cards to subscribe to the websites or otherwise used the services of the websites.  Of these, approximately 61 percent of the witnesses testified that they did not enter their credit card on the websites with which they were presented, but they acknowledged that they had registered or otherwise entered their credit card data on other dating or erotic websites, as well as on gaming, betting, sweepstakes, verification or ordering websites for computer software. Only 27 witnesses said that they noticed some or all of the debits, and 30 witnesses had not noticed the debits.

        vii.  <u>Sweden</u>:  Twenty witnesses stated that they had not used the services of the websites they had been given nor entered their credit card information on the websites.  Of these, approximately 55 percent of the witnesses had previously entered their credit card details on other dating and/or erotic sites and/or investment sites but not on the websites in question.  Only two of the 20 witnesses stated that they noticed all or part of the debits, and 18 witnesses had not noticed any of the debits.

    7.   That in addition to the facts outlined above, Germany's request presents the following facts, among others, related to

GARRONI's specific involvement in the criminal scheme and commission of the above-referenced offense:

    a. GARRONI is one of FSX's directors, serving as FSX's Chief Executive Officer, and is an essential decision-maker of the FSX network. The German investigation revealed that GARRONI determined which payment providers to use, which documents to use to meet know-your-customer requirements to onboard with the payment services providers, and which fictitious merchant and website accounts to show to the payment services providers:

        i. On or about May 7, 2013, GARRONI sent an e-mail to Weigand in which he wrote, "[w]e will prepare the application for [a Los Angeles-based-payment services provider]. Probably 3 separate URLS and descriptors, if that works? In anticipation, can we get the API[5] for the integration?" Weigand responded by sending an e-mail to GARRONI in which he wrote, "I still need an idea on volumes for [the Los Angeles based-payment services provider]. They do hand out the API once they do have the application." Weigand then instructed GARRONI to "hand in different URLs and descriptors" and asked whether he was "fine with the 4% CB-ratio[6] or should I try to push the count stuff through." GARRONI replied by e-mail and wrote, "I guess it is dependent on the tolerance that [the Los Angeles based-payment services provider] has. We would probably rather manage the accounts to the count threshholds [sic]? I would say $50,000 an account for 3 accounts to start, $150,000."

---

[5] "API" appears to be an abbreviation for "Application Programming Interface," which are tools that allow different software programs to communicate with each other and securely share data.

[6] "CB-ratio" appears to be an abbreviation for "Cost-Benefit Ratio" which is used to determine a project's profitability.

        ii. In the above e-mails exchanged between GARRONI and Weigand on or about May 7, 2013, they also discussed using a UK payment processing company. In one of those e-mails, GARRONI wrote, "we are putting together the ULR's (5) and the corp information for [the UK payment processing company]. I will update you when that package will be ready." Later that day, Weigand assured GARRONI by e-mail that "[a]s soon you've things prepared for [the UK payment processing company] let me know and I'll hand it in." On or about May 31, 2013, Weigand copied GARRONI on an e-mail in which he acknowledged receiving the documents prepared for the UK payment processing company: "Prefect, received. [¶]Will proceed ASAP!" GARRONI responded by asking Weigand, "[c]an we get the API for an integration for [a Florida based information technology company] with [the UK payment processing company]."

        iii. On or about January 20, 2016, GARRONI sent an e-mail to Weigand and remarked, "[t]was great spending some time with you in Las Vegas." GARRONI then wrote that "I wanted to follow up with you on the submission process for [Concardis, a German payment services provider]?[sic] Can we get the application package for ConCardis [sic]? I wanted to get a head start on preparing the non-adult dating packages." GARRONI added, "I look forward to ramping up the business at ConCardis [sic] and [German payment services provider B&S Cardservice]."[7]

        iv. In an e-mail sent by Weigand to GARRONI on or about March 2, 2016, Weigand wrote "[f]or [the German payment services provider] I do only need the company pack and we'll prepare

---

[7] B&S Cardservice also was known as B+S Card Service GmbH.

13

everything." Weigand instructed GARRONI to keep what appears to be a fictitious merchant with the German payment services provider: "it is fine." Weigand also assured GARRONI that "[w]e can board more at [that provider and another payment services provider] - so feel free to send company packs over."

        v. In an e-mail sent on or about November 22, 2016, GARRONI wrote that after a "performance review with Ray [presumably R. Akhavan], he wanted to lower the transaction rates charged by two German payment service providers by one percent. According to communications discovered on Weigand's mobile telephone that was seized in connection with his 2020 prosecution in the Southern District of New York ("Weigand's seized telephone"), on or about July 10, 2019, and October 15, 2019, GARRONI and Weigand again discussed transactions fees and different ways to reduce them.

    b. GARRONI was responsible to maintain good and close relationships with German payment providers used by the FSX network. For example, on or about June 14, 2018, GARRONI sent an e-mail to a co-defendant affiliated with payment services provider Wirecard and explained that "[r]ecently we applied for Wirecard Bank Accounts for" eight enumerated UK companies and six Cyprus companies. He stated that another co-defendant who was copied on the e-mail "is designated as the 'Account Manager' for all the 8 UK Companies . . . . He will also be the [']Account Manager' for the Cyprus Companies once their accounts are issued." GARRONI explained the co-defendant was "a friend for many years as well as our attorney in London. We would like to create a relationship for him with Wirecard . . . . To that end, I was hoping to arrange for him to visit Wirecard before he is

off on his July holiday and that you could make the appropriate introductions?"

   c. In addition, GARRONI was responsible for addressing problems encountered by the payment service providers with fraudulent credit card transactions generated by the fictitious merchants that were part of the FSX network:

    i. On or about April 14, 2021, an individual using an FSX account sent an e-mail to GARRONI and a co-defendant employed by Concardis highlighting problems that the German payment services provider had settling credit card transactions generated in the FSX network. After the co-defendant replied that the issue would not be resolved for four to five weeks, GARRONI wrote an e-mail asking the men to "get on a call".

    ii. On or about May 5, 2021, GARRONI sent an e-mail to the co-defendant employed by Concardis in which he questioned FSX's open invoices and asked whether "[t]hese are transaction fees, high risk registration fees, chargeback fees?" He added that he was "looking into this now. Any specifics would be appreciated." Later that day, one of the other leaders of the FSX network replied: "Indeed we are working through the logistics of getting this sorted out." He lamented that, "[t]he settlement project we are all working through put us back out of our schedule. We are still working on catching up monthly for the previous years. I believe we are paid from now (excluding april [sic]) back through October.. but will confirm with the team."

    iii. GARRONI also participated in discussions regarding third-party inquiries of suspected fraud and helped

coordinate the steps necessary to protect the network from detection, including the following:

(I) According to communications discovered on Weigand's seized telephone, on or about January 17, 2020, GARRONI and Weigand discussed the coordination of traffic to different fictitious merchant sites. GARRONI requested that Weigand ask one of Wirecard's fraud detection specialists how to determine whether a website might not have any real traffic at all.

(II) On or about January 17, 2020, a co-defendant sent an e-mail to GARRONI, in which he wrote, "We have a case, in which we need your input by Monday night latest.  VISA has opened a fraud investigation and contacted BS [presumably B&S Cardservice] . . . ."  The e-mail discussed VISA identifying a transaction "that was used for a phishing scam of card data" and where "[t]he merchant (also the other MIDs[8] and eventually other merchants from the same group) has several chargebacks about various scam practices."  In addition "[t]he merchant websites after the login doesn't [sic] look like websites used by genuine customers"; "[t]here are no active users on the website and the few profiles seem [to] be dummy data"; "[p]ayment forms aren't PCI complaint and can be used for phishing"; and "[c]ardholders are billed from around the world, websites doesn't [sic] have traffic according to it . . . ."  The e-mail further states that VISA required the issuance of a refund for the identified transaction and an investigation of "all MIDs belong to the Merchant and the whole group regarding scam practices."

---

[8] "MIDS" and "mids" appear to be abbreviations for "Merchant Identification Numbers," which payment service providers require to process payments.  The criminal organization often used these abbreviations as for a reference to their fictitious websites.

The e-mail concluded with a recommendation to "close the merchant (with all MIDs) as soon as possible." In response to the co-defendant's suggestion that they discuss the matter further, GARRONI sent an e-mail later that day inquiring about the time of the conversation.

(III) On or about March 5, 2020, the co-defendant wrote an e-mail to GARRONI (copying Weigand) to inform him of another VISA fraud investigation and to ask for his assistance: "We have another case unfortunately. [¶]Can you look into this and execute the requests of Concardis?" GARRONI replied on or about the following day and provided an explanation of what happened, noting that the fictitious merchant "has been terminated from marketing the company websites." On or about March 7, 2020, GARRONI sent a detailed e-mail to the co-defendant, again copying Weigand, to provide "additional clarifications" to address concerns raised by the VISA fraud investigation.

(IV) On or about March 30, 2020, the same co-defendant sent an e-mail to GARRONI and the other leaders of the FSX network that included an excerpt from another e-mail regarding fraud detection. That excerpt included instructions to "cancel/ reserve all auths on these cards listed enclosed within the next 24 hours"; "[r]efund where already captures within the next 24 hours"; "[b]lacklist the BINs"; and "[l]eave Cyprus and Greece for this point in time (no further sales." According to the excerpt, "an issuer from Cyprus contacted Visa Risk Services about a fraud attack involving its cards. Transactions in the amount of about 50€ were made last Friday at multiple merchants acquired by Concardis." The co-defendant instructed GARRONI and the other recipients to "send me

17

an email with what you accomplished by the end of today, what the plan is, and what you found about the source of the traffic."

(V) On or about March 30, 2020, the same co-defendant warned GARRONI and another individual by e-mail about concerns of the German payment service providers about the traffic of several fictitious websites from Greece and Cyprus that could lead to detection: Concardis is ringing the alarm about another case of problematic traffic [¶]The MIDs are in danger". The co-defendant requested that they "block Greece and Cyprus" and "refund all transactions . . . made through these issuers within the last 7 days. There is a high risk for fraud and chargeback, which we need to pre-empt." He wrote later in the day that "BS [presumably B&S Cardservice] was also contacted by issue/scheme – attached is a spreadsheet with all MIDs affected. [¶]Please refund all transactions on these BINs[9] that occurred in the last week. . . . [¶]Keep me posted on your progress, please."

(VI) On or about April 10, 2020, the same co-defendant e-mailed GARRONI and the others, including the other leaders of the FSX network, to warn them about fraud detection: "Bad news on Good Friday: Worldline [a French payment processing company] is closing MIDs due to excessive fraud rations. [¶]Unfortunately, I have to inform you that we need to close the below MIDs due to excess fraud ratios. Those accounts will be terminated as of April 28th." He added that "[t]his decision has been made by the Worldline Executive Risk Committee yesterday evening. Official communication will follow

---

[9] "BINs" appears to be an abbreviation for "Bank Identification Numbers," the digits on a credit card that identify the issuing financial institution, such as VISA or Mastercard.

18

next week, however, I wanted to provide you with a heads up already. [¶] Please keep a close look on the other account and have them stay under the 15%." Later that day, GARRONI responded by e-mail: "Thanks for the notice. The 15% is coming from Worldline?"

8. That U.S. law enforcement believes that GARRONI may be found within the jurisdiction of this Court. According to the United States Marshals Service:

    a. California Department of Motor Vehicles ("DMV") records reveal that, on or about January 20, 2023, the DMV issued a California driver's license (No. ****5272) to "Andrew Garroni," which lists his date of birth (**/**/1955) and an address in Los Angeles, California. That date of birth corresponds with the date of birth Germany authorities provided for GARRONI. Further, the man depicted in the driver's license photograph, taken on or about January 20, 2023, appears to be the same person depicted in photographs of GARRONI German authorities to the United States.

    b. Law enforcement records also reveal that on or about April 26, 2025, GARRONI, using a U.S. passport (No. *****3962), arrived in Los Angeles, California, by air from Paris, France.

9. That the Government of Germany has represented that it will submit a formal request for extradition supported by the documents specified in the Extradition Treaty, within the time required under the Extradition Treaty.

10. That GARRONI would be likely to flee if he learned of the existence of a warrant for his arrest.

WHEREUPON, complainant respectfully requests that a warrant for GARRONI's arrest be issued, based on probable cause, pursuant to Title 18, United States Code, Section 3184, and the extradition

treaty between the United States and Germany, so that the fugitive may be arrested and brought before this Court to the end that the evidence of criminality may be heard and considered, and that this complaint and the warrant be placed under the seal of the Court, except as disclosure is needed for its execution, until such time as the warrant is executed.

DATED: This 3rd day of November, 2025, at Los Angeles, California.

Respectfully submitted,

BILAL A. ESSAYLI
First Assistant United States Attorney

IAN V. YANNIELLO
Assistant United States Attorney
Chief, National Security Division

_____
JOHN J. LULEJIAN
Assistant United States Attorney

Attorneys for Complainant
UNITED STATES OF AMERICA

Subscribed and sworn to by the applicant on this 1st [struck through, replaced with 3d] day of November, 2025.

_____
HONORABLE JACQUELINE CHOOLJIAN
UNITED STATES MAGISTRATE JUDGE

20